Good morning. May it please the Court. Lee Tucker of the Federal Defender's Office of Arizona for Alfredo Landeros. I'll keep an eye on the clock and attempt to reserve two minutes for rebuttal. Mr. Landeros is asking for relief from the Court. We have three alternative requests. First, suppression of the evidence based on the failure of the officers to comply with the Fourth Amendment as analyzed by, excuse me, Rodriguez and Evans. Second, dismissal based on the outrageous conduct of the officers in using unreasonable force and attempting to extract a quid pro quo when Mr. Landeros refused to give his name. And third, remand to the District Court for two reasons. First, because there was a failure to follow the required Article III procedure in that the magistrate judge made a report and recommendations, but the District Court did not engage in the required de novo review of the evidence and a de novo determination of the matter, including the contested issues, which included quite a bit of contested credibility concerns. And also, along with remand, the magistrate judge applied the incorrect legal standard in addressing the motion to suppress. The magistrate judge applied Turvin rather than Rodriguez and did so and specifically found that the duration of the stop was reasonable overall because of the concerns the officers had about the young women in the back seat. So even the Turvin finding was not related to our client and the extension of the stop to pursue our client's name.  Kagan. To clarify, the asserted credibility contradictions and also, therefore, I think the concern about whether the district judge adequately reviewed that really only has to do with the claim of outrageous conduct and not with the Fourth Amendment stop, which was just several minutes, really, before the open bottles were found. Is that right? The majority of the credibility issues do relate to the handcuffing of Mr. Landeros, but it's not limited to that. It does also impact the motion to suppress because Officer Baker claimed that he had concerns about alcohol, the smell of alcohol. That was not the two civilian witnesses disagreed with that. Both said that they were told by Officer Baker he was asking for ID because he was concerned about a curfew violation. No one in the car was ever given any kind of test to determine if alcohol had been used. There was never any question made to anyone in the car about the use of alcohol or whether anyone had been drinking. And given the extreme credibility problems with all four officers, and in particular with Officer Baker, because it was Officer Baker's declaration that formed the basis for the magistrate judge's determination, his credibility does impact also the decision on the motion to suppress. He only focused on the girls and their age. He never at any time said that he had any reason to ask Mr. Landeros for his ID other than that it was standard operating procedure. And in fact, that's what the magistrate judge noted in his R&R, that he was concerned about that it was standard operating procedure. Now, the magistrate judge got it wrong in concluding that it was a lawful order to supply identification. That's not correct. Under Arizona law, an order to supply identification is only lawful if it is intended by reasonable suspicion of criminal wrongdoing by that person. So once they found the open bottles of beer, which I gather is at least a misdemeanor in Arizona, is that right? Presumably, Your Honor. Then they could ask for the ID? Presumably, they could have. At that point, there had already been an extension of several minutes of the stop dedicated solely to extracting Mr. Landeros' name. They had, and Officer Baker and Romero both testified to this, he was already arrested and the decision had been made to arrest him based on his refusal to identify himself before they saw those beer bottles. As he was being taken out of the car and handcuffed, that's when they saw the beer bottles. So at that point, we've already got a Rodriguez violation. I also want to, and there's never any place where Officer Baker or any other officer testifies otherwise. Turning to the handcuffing, now I know it is not common for a court to use its supervisory power to dismiss. However, the conduct here was truly outrageous. And what we see is a man put in handcuffs and kept in extreme pain for 30 minutes, during which time he is continually asking for help. Every single one of the officers is not credible on this point. Officer Baker says that, so it was Officer Romero who put on the handcuffs. That's about the only thing we can be sure of. But Officer Baker says that we checked, we, meaning himself and Romero, checked the cuffs multiple times. That is contradicted by the video evidence, which, as we point out, neither the magistrate judge nor, of course, the district court judge referred to or there's no indication they took it into account at all. No one checked his cuffs while he was in the cruiser. And further contradicting that, at the end of the video evidence, the dash cam evidence, we have Baker at the car with Mr. Landeros. This is at 30 minutes and 27 seconds saying, we're going to fix it. So after half an hour, he says, we're going to fix it. Romero says, contradicting Baker, who said they checked it multiple times, Romero says, I didn't need to check it because I'd already checked it, presumably meaning when he first handcuffed him. That's not reflected in the video evidence. And then we have Baker, I mean, sorry, Romero on tape at the cruiser. Kagan. On the video evidence, I watched some of it. It doesn't actually show much. I mean, the original handcuffing was pretty brief. Correct. The original handcuffing was very brief. Sergeant Montano was not at that original handcuffing. But then we have the transcript also of the video. And we have Montano and Romero at the car with Mr. Landeros. And we have Officer Romero saying to Landeros, oh, the right one is for circulation. I mean, the problem is that this is an extremely unusual basis for dismissing a case, and the situations alluded to are much more extreme than this. It is unusual. It is unusual, Your Honor. And what we have here is his hands hurt badly. I beg your pardon? I mean, his hands hurt badly. That's what we have. Well, what we have is not limited to the pain. I mean, if one believes everything. It's the quid pro quo. It's the quid pro quo. And that's what's illegal here. Everything we have pages and pages in the transcript. And sort of tantamount to torture is what you're saying. In the sense that there is. It's unreasonable use of force. It's an unreasonable use of force. And we have pages and pages of him saying, you need to check my cuff. It's too tight. And I'm saying, what's your name? The trouble is it's fairly illogical. One thinks, all right, if you have a problem, bring a 1983 case and complain about it. That is another option. And I'd also just like to point out, I'm going to stop soon and save my time for rebuttal. There were dash cam videos here, which is great. It adds a lot to it. Clearly, these officers were very angry with Mr. Landeros. They're not going to punch him when they're on camera. But to put him in excruciating pain and leave him there and then essentially taunt him is what happened here. And then they ‑‑ Where did they taunt him? Over and over again, Your Honor, when he asked for relief and asked that his cuffs be tightened. And they said, what's your name? What's your name? Yeah, you know, Montano also says, you're going to treat me with respect. You're going to talk to me with respect. What's your name? You call that taunting if they ask him for his name? If they do it in response to his expression that he is in extreme pain. And they know that he's in extreme pain, yes. Okay. I'd like to reserve my time. Thank you. Good morning, Your Honor. May it please the Court. I'm Sharice Arce, Assistant United States Attorney on behalf of the United States. I will turn to point three. It seems like that was an area of interest for the Court regarding the initial stop. I'm sorry. You said you were going to turn to what point? Issue three regarding the stop itself. And the government's position is that the defendant has failed to show that the district court clearly erred in denying the motion to suppress. It's uncontested that ‑‑ But where is clearly erred from? I'm sorry, Your Honor? Where are we getting clearly erred? You mean factually? Correct, Your Honor. After the finding of facts? Yes, Your Honor. But one contention that's made is that the wrong standard was applied, that the pre-Rodrigo standard was applied. Right. But the standard ‑‑ Right, wasn't it? Isn't it correct that that was what happened? Yes, Your Honor. So isn't that a problem? In terms of the clear error? Well, no, in terms of our review. If the magistrate judge applied the wrong standard, then we don't review for clear error of facts. We refer ‑‑ we review for the fact that he applied the wrong standard and what would have happened if he applied the right standard. What clear error are you ‑‑ I didn't understand them to be making a factual contention of clear error. There was no error. And the defendant hasn't shown that the lower court did err in its factual and credibility findings regarding the stop itself. Counsel, I'm just curious regarding the findings that were made. Why wasn't there any reference to the video footage in terms of the credibility determinations and what actually transpired? I can't say for sure why the magistrate didn't reference the video itself. But the video itself was shown at several different points about 12 different times to the magistrate judge. So ‑‑ and then the magistrate judge did acknowledge receipt of the exhibit that's on the record. And also, there was no objection from the government. I think that is the best ‑‑ But isn't there a contradiction in some respects between the video and the findings? I'm not sure they matter. But when he said that the defendant was never cooperative and was ‑‑ at points he was quite cooperative. At the beginning, for example, when they handcuffed him and when they walked him to the car, he was perfectly calm and cooperative. Yes, Your Honor. And those were also brought out in ‑‑ those were brought out in the evidentiary hearing. But then the description seems to say otherwise. The description in ‑‑ of the facts in the magistrate judge's report. Well, the magistrate can weigh the evidence. There's no requirement. It can weigh it, but there was nothing to weigh. There was a video that showed what happened. Correct. And those were also shown to ‑‑ the magistrate did consider those. But the magistrate judge didn't say how much weight, if any, was given to the videotape as opposed to how much weight was given to the officer's testimony. Because the defendant was relying heavily on the video evidence to support his version of events. And the magistrate judge didn't grapple with the discrepancy between the defendant's version supported by the video, as he asserted, and the officer's testimony. And that appears to be kind of missing from the analysis. Noted, Your Honor. But the court is not required to state ‑‑ it's not required to state it weighed one evidence more heavily than the other. As Ruberio cited in our brief, that so long as the district court's view of the evidence is plausible in light of the record, it can't be clearly erroneous. Because even if the reviewing court would have weighed the evidence differently had it sat at the trier of fact. And so ‑‑ The problem I'm having is that it does not appear that the magistrate judge weighed the evidence at all. It totally failing to discuss the video evidence, which was so heavily relied upon by the defendant, seems to be a miss. I understand, Your Honor. But no evidence suggests that the magistrate or the district court disregarded or discounted it based on the fact that the video was attached to the defendant's motion to dismiss. Also, as noted before, during the evidentiary hearing, the videotape was played for the magistrate judge about 12 different times. The defendant discussed the videotape at length in his argument to the magistrate judge. For example ‑‑ I'm sorry. Go ahead. And lastly, that the magistrate acknowledged admission of the two videos as evidence as the only thing that was admitted and was not objected to by the government. And your question, Your Honor? Could we address the stop to begin with? Sure. What was the basis? When was he arrested, and what was the basis for the arrest, and what was the basis for demanding that he provide identification or his name at the point that it was first demanded? Sure. The basis of the initial stop was a traffic violation. Right. And so there was separate reasonable suspicion. So after the stop, Officer Baker smells alcohol in the car. And he notices that the occupants appear to be underage. Did he ever say that Landros appeared to be underage? To him in the car? Or ever. In the evidentiary hearing, he does initially state that the occupants appear underage. He doesn't specify which occupants. Later on in cross-examination, he does state that he thought that just the backseat driver.  So he didn't think Landros was underage. Well, it's unsure. He did say that the occupants. And so although asking for ID is permitted as part of an ongoing traffic stop, and you don't need additional reasonable suspicion for that, that is consistent with rodriguez. What is permitted? Asking for the identification of passengers. For a nondriver? Yes. And that's cited in Diaz v. Castaneda, which we do cite in our brief. And so the officer had separate reasonable suspicion to continue to detain the occupants for the separate reasons of possible underage drinking and also the curfew violation. Also a what violation? But not Landros. So ultimately, I mean, I don't see how you can say that because he put an S on occupants when there were three occupants and he later says, no, he didn't think Landros was underage, that he thought Landros was underage. So I'm assuming that he never thought Landros was underage. So I gather you can equivalent with that, but I don't know on what basis. When he said specifically he didn't think that. Well, putting that aside, even if he didn't know about the age, whether the defendant he was 22 at the time, which, you know, anyone can determine whether someone is over 21 if they're one year above it. But he didn't think so. He didn't say that's why he was doing it. He didn't. It didn't reflect that in his report. But even so, the Court has held that a period of detention may be permissibly extended where new grounds for suspicion of criminal activity continue to unfold, and that is the government's position. The defendant refused to provide identification. He was asked to exit, which is also part of the case.  Kagan. Kagan. Kagan.      Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan.         Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. The basis for that is? Well, for that is the dias-castaneta, and that is for determining whether there was – in this case, it was a curfew violation, where anyone who was under the age of 18 – let's assume he had no individualized suspicion of Landerose for anything, because that seems to me to be the case. He didn't say he did. He's never said he did. Does he then have the authority to ask everybody in the car for a traffic stop for I.D.? And not just ask, but insist upon it, and arrest him for not giving it, I gather? Well – Was he arrested for not – well, let's get to that. Does he have the authority to ask him? Demand it, not just ask him. Demand it. Well, demand, no, but he did. But he did demand it. He did ask for it, and the defendant was interjecting, interrupting, and he was the one who was providing more reasonable suspicion for the defendant. Reasonable suspicion of? For – the officer had every right to determine whether there was a curfew violation. He was asking for identification. The defendant was interrupting. But he didn't say that's what he was doing for Landerose. I'm sorry? As I understand it, when he testified, he said he did not believe that Landerose – when does the curfew kick in? Is it 18 or 21? 18. 18. And he never said that he thought Landerose was under 18, or that's why he was doing it. Did he ever say that? No, not – No. Okay. So he never said it. So where are we getting it from? So let's assume it's not true for now, okay? If it's not true, if he doesn't think it and it wasn't the reason, then does he have the authority to demand, because he demanded, he insisted on the ID, on the question, which was stopped for a traffic stop. Correct. And – but also there was the reason for the – Correct what? Yes, he does have that authority? He does have the authority to ask for it. But he didn't just ask. I mean, that's clear. He demanded it, and he – why was he initially arrested? Initially it was for refusing to provide identification and also for – Right. So isn't that demanding it, if you arrest somebody for not doing it? Yes, Your Honor. Okay. And also the – the smell of alcohol. And so he refused to exit the vehicle, which is permissible to do when doing a traffic – when executing a traffic stop. So for that reason, the – it was permissible to ask him to exit. And the defendant himself provided the reasonable suspicion by being uncooperative by not providing identification or refusing to exit, which are all permissible to ask. So not providing identification when you have no obligation to provide identification provides reasonable suspicion to – to start an identification. No. And that's what you're saying, or at least you're not being clear. I apologize if I'm not being clear. But the defendant also – the other issue that was being examined was whether there was unlawful consumption of alcohol. The defendant – the officer did smell alcohol coming from the vehicle. And I noticed that my time is running out. No, go ahead. And so for that reason, it's not just the curfew violation, the under 18. It was also the – Well, wouldn't the whole rest of the – I mean, the whole rest of the evidence is not terribly relevant to the stop except to the credibility determination, right? So if the finding of fact was that they did, in fact, smell this alcohol, that's a credibility determination, right? Yes, Your Honor. Which – and therefore, why wouldn't the rest of it, i.e., the comparison of the testimony to the film be pertinent, as Judge Rawlinson – which, as Judge Rawlinson was suggesting, there's no particular evidence that either the magistrate judge or the district judge, particularly the district judge, ever did that? I'm not sure I understand your question. Well, I'm saying that it would appear that the credibility determination about what happened after the arrest isn't terribly relevant to the – to the arrest and the stop, except if Judge Baker – if Officer Baker's testimony about smelling the alcohol depends on a credibility determination, then it might be, or would it be, is my question. If I'm understanding your question correctly, there's nothing in the video evidence to contradict Officer Baker's credibility at the initial point of the stop. All right. Your time is up. Thank you very much. Thank you, Your Honor. We would ask that this Court affirm. Thank you, Your Honor. You're absolutely correct. Officer Baker testified. It's in the excerpt of his record at 74. The reason for the arrest was the failure to show identification. The government relied on Diaz-Castaneda – I'm sorry. I'm sorry. That Officer Baker did testify that the reason for the arrest was the failure to show identification, as Your Honor had said. Related to that, both the magistrate judge and his R&R – But that would be okay if they had reasonable suspicion at the time they demanded the identification. If they had reasonable suspicion of an independent – of criminal wrongdoing. So what about the alcohol? The alcohol – again, the alcohol did not come up in the questioning of any of the passengers. The alcohol was not mentioned to the girls. They were told it was a curfew issue. Officer Baker never said that he asked Mr. Landeros for ID or continued that pursuit of Mr. Landeros for anything related to alcohol. And the magistrate judge, also in his report and recommendations, did not find any reasonable suspicion related to alcohol. Of course, those findings were problematic. I did want to note Diaz-Castaneda, also used by the magistrate judge, is completely an opposite. That was a case where they asked for the passenger's identification so he could drive the car when the driver had been arrested. And finally, under Hibble, it's clear that it is a Fourth Amendment violation to arrest someone simply for the failure to identify themselves unless there is wrongdoing. Counsel, do you agree with opposing counsel that the videotape had no role to play in the credibility determination? No, Your Honor, I do not. And also, counsel mentioned that it was played several times in the hearing. Very short snippets of it were played in the hearing. Certainly nothing to compare to the 30 minutes from the two different angles and two different sources of audio. And again, the magistrate judge never mentions the video in his R&R. And so there's no indication that he – well, he didn't address the credibility concerns that had been raised by Mr. Landeros. Thank you. Thank you very much. The case of United States v. Landros is submitted. We'll go to United States v. Campbell.
judges: Berzon, Rawlinson, Watford